### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

SHERRY DEDMAN,

                PLAINTIFF

v.

PHILIPS NORTH AMERICA LLC;
KONINKLIJKE PHILIPS N.V.; PHILIPS
HOLDING USA, INC.; and PHILIPS RS
NORTH AMERICA LLC,

                DEFENDANTS

**Civil Action No.**

## COMPLAINT

Plaintiff Sherry Dedman for her complaint, alleges the following:

## Introduction

1.    Plaintiff brings this action on behalf of herself and all others similarly situated to obtain monetary and other appropriate relief for herself and members of the Classes (defined below) due to Defendants' unlawful acts.

2.    Defendants Philips North America LLC ("Philips NA"); Koninklijke Philips N.V. ("Royal Philips"); Philips Holding USA, Inc. ("PHUSA"); and Philips RS North America LLC ("Philips RS") (all four together, "Defendants," or "Philips") manufacture, market, and sell a range of products that assist consumers with respiration when sleeping.

3.    Philips manufactures, markets, and sells a particular line of respiration products called continuous positive airway pressure ("CPAP") and bilevel positive airway pressure (BiPAP) devices for patients with obstructive sleep apnea.

4.    Philips also manufactures, markets, and sells a range of ventilator devices for patients with respiratory conditions.

5.      Philips has, for years, known of serious risks posed to owners of its machines by a type of foam Philips used for sound insulation in the machines, known as polyester-based polyurethane ("PE-PUR") foam. That insulation, when owners used the devices in a manner that was typical and foreseeable by Philips, created a range of health risks, including headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects.

6.      On June 14, 2021, Philips issued a recall for many of its CPAP and BiPAP machines, as well as certain ventilators (the "Problem Products"). Philips, through the recall, admitted to and advised of the serious health risks related to the products.

7.      Plaintiff is the owner of two of the Problem Products—two "DreamStation CPAP" machines. She purchased her first DreamStation in 2017. Her insurance did not cover the purchase of a second CPAP machine until five years after purchasing the first CPAP machine. Nonetheless, Plaintiff purchased with her own money a new DreamStation in late 2020 after she suffered from a series of sinus infections and other respiratory issues. Despite purchasing a new DreamStation, Plaintiff continues to suffer from the same health problems.

8.      Critically, the Philips recall does not provide owners such as Plaintiff a new CPAP machine, money for a new CPAP machine, or parts or other methods to repair their current CPAP machine. Instead, the "recall" is not a recall at all but instead is simply an informational bulletin about the harmful effects of the Problem Products.

9.      Notably, although Philips recently launched a new model of the DreamStation, the "DreamStation 2," which does not have the same problems as the original DreamStation, Philips does not offer to replace the Problem Products with the new, properly functioning, non-harmful machines such as the DreamStation 2. Instead, Philips uses the so-called "recall" as a sales pitch

to encourage owners to purchase a new machine from Philips. That is, Philips is actively profiting from its so-called "recall."

10.    Many owners of the Problem Products simply do not have the option of buying a new machine because they live on a limited income and, like Plaintiff, are not eligible to have the costs of a new machine covered by insurance.  Accordingly, owners like Plaintiff essentially have no choice other than to continue using the Problem Products, notwithstanding their harmful and potentially catastrophic effects.

11.    There is, of course, a way Philips could remedy all of these problems. Philips could provide owners new, non-harmful machines comparable in functionality to the Problem Products. Alternatively, it could provide a refund to owners, who could then use the refund to purchase a new machine of their choosing (some consumers, understandably, no longer trust Philips to deliver a safe and effective product). Philips has taken neither of these steps, instead leaving owners of the products to decide between two horrible options: going without a CPAP machine or using a CPAP machine that might have significant adverse effects on their short-term and long-term health.

12.    Plaintiff brings this case to force Philips to provide proper remedies to Plaintiff and other consumers like her. State consumer protection laws, the UCC, and the common law provide a range of remedies for the wrongdoing present here. Plaintiff invokes such remedies to compel Philips to stop using the recall as a marketing scheme for its new products and start providing consumers with the warranty service, refunds, or other compensation to which the law entitles them.

## The Parties

13.     Plaintiff Sherry Dedman is and has been a resident and citizen of Cocoa, Florida, for twelve years. Plaintiff purchased two DreamStation CPAP machines in Florida—one in 2017 and another in late 2020. Plaintiff purchased her DreamStation machines in reliance on representations disseminated by Defendants that the products were beneficial to her health. Had she known that the products exposed her to serious health risks, she would not have purchased the DreamStation machines and instead purchased other non-harmful CPAP machines. When she owned her DreamStations, Plaintiff observed black matter on the foam of her original DreamStation and experienced sinus infections and other respiratory problems. She purchased her second DreamStation to address these issues, but the problems persist.

14.     Defendant Koninklijke Philips N.V. ("Royal Philips") is a public limited liability company established under the laws of the Netherlands, with a principal place of business in Amsterdam, the Netherlands.

15.     Defendant Philips North America LLC ("Philips NA") is a Delaware corporation with its principal place of business in Cambridge, Massachusetts. Philips NA is a wholly-owned subsidiary of Royal Philips. Upon information and belief, Philips NA manages Royal Philips's various lines of business, including Philips RS, in North America. The sole member of Philips NA is PHUSA, a Delaware corporation with its principal place of business located in Cambridge, Massachusetts.

16.     Defendant Philips Holding USA, Inc. ("PHUSA") is a Delaware corporation with its principal place of business in Cambridge, Massachusetts. PHUSA is a holding company that is the sole member of Defendant Philips NA.

17.     Defendant Philips RS North America LLC ("Philips RS") is a Delaware corporation with its principal place of business located in Pittsburgh, Pennsylvania. Philips RS previously

operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.

18.     Royal Philips, Philips NA, PHUSA, and Philips RS are hereinafter collectively referred to as "Philips" or the "Defendants."

## Jurisdiction and Venue

19.     This Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which Plaintiff and some members of the Class are citizens of states different than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A).[1]

20.     Venue is proper in this District because Philips North America LLC has its headquarters in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

21.     The Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in this District, and the events giving rise to Plaintiff's claims arise

---

[1] Because jurisdiction is based on the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), even though two Defendants are limited liability companies, each Defendant is a citizen of the states "where it has its principal place of business and…under whose laws it is organized." 28 U.S.C. § 1332(d). That is, the rules applicable in traditional non-class diversity cases, under which the citizenship of limited liability companies would be determined by the citizenship of those companies' members, do not apply to this case. *Erie Ins. Exch. V. Erie Indemn. Co.*, 722 F.3d 154, 161 n.7 (3d Cir. 2013) (explaining that the Class Action Fairness Act "evinces an intent that suits by unincorporated associations be treated like suits by corporations in that the citizenship of the association for diversity purposes is determined by the entity's principal place of business and not by the citizenship of its members"); *Davis v. HSBC Bank Nev., N.A.*, 557 F.3d 1026, 1032 n.13 (9th Cir. 2009) ("For qualifying class actions such as this one, CAFA abrogates the traditional rule that an unincorporated association shares the citizenship of each of its members for diversity purposes…."). Plaintiffs therefore do not allege information on the members of any LLC, as such information is neither necessary nor relevant under CAFA's jurisdictional provisions.

out of and relate to Defendants' contacts with this District. Moreover, Defendant Philips RS has its principal place of business in the Commonwealth. Defendants Philips RS and Philips NA are controlled by their parent Royal Philips. Defendants' affiliations with this District are so continuous and systematic as to render them essentially at home in the Commonwealth.

22.     Defendants have transacted business, maintained substantial contacts, purposefully targeted consumers and medical professionals for sales of its devices, and committed overt acts in furtherance of the unlawful acts alleged in this complaint in this District, as well as throughout the United States. Defendants' wrongful acts have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

## Factual Allegations

### I.     Continuous Positive Airway Pressure Therapy and Bi-Level Positive Airway Pressure

23.     Continuous positive airway pressure ("CPAP") is a form of positive airway pressure ventilation in which a machine applies a constant level of pressure greater than atmospheric pressure to the upper respiratory tract of a person.

24.     The application of positive pressure may prevent upper airway collapse, as occurs in obstructive sleep apnea or reduce breathing difficulty caused by conditions such as acute decompensated heart failure.

25.     CPAP is the most effective treatment for obstructive sleep apnea, in which the mild pressure from the CPAP prevents the airway from collapsing or becoming blocked. CPAP is very effective at eliminating obstructive sleep apneas in most people who use the therapy at their physician's direction.

26.     Upper airway resistance syndrome is another form of sleep-disordered breathing with symptoms similar to obstructive sleep apnea but not severe enough to be considered OSA. CPAP can treat UARS as the condition progresses to prevent it from developing into obstructive sleep apnea.

27.     CPAP machines possess a motor that pressurizes room temperature air and delivers it through a hose connected to a mask or tube worn by the patient. This constant stream of air opens and keeps the upper airway unobstructed during inhalation and exhalation. Some CPAP machines have other features as well, such as heated humidifiers.

28.     BiPAP therapy is a common alternative to CPAP therapy for treating sleep apnea. Like CPAP therapy, BiPAP therapy involves using a nasal or facemask device to maintain air pressure in an individual's airway. However, BiPAP is different from CPAP therapy because BiPAP devices deliver two alternating levels of pressurized air into a person's airway, rather than the single continuous level of pressurized air produced by a CPAP device. An inspiratory positive airway pressure assists a person to inhale, and then an expiratory positive airway pressure assists a person to exhale.

29.     CPAP and BiPAP machines can be noisy; noise is one of the primary complaints of users that deter some from using the otherwise beneficial technology over the long term. Accordingly, many CPAP and BiPAP machines are insulated for sound to avoid disrupting owners' sleep. Among the sound abatement measures that manufacturers use is sound abatement foam in the machine itself.

## II.    Defendants' Manufacture of the Problem Products.

30.     Defendants manufactured, marketed, sold, and distributed a lineup of CPAP and BiPAP devices as well as ventilator devices under its "Sleep & Respiratory Care" portfolio.

Defendants designed these devices to assist individuals with sleep, breathing, and other respiratory conditions, including sleep apnea.

31.    Defendants obtained Food and Drug Administration ("FDA") approval to market the Problem Products, including the machine used by Plaintiff, under Section 510(k) of the Medical Device Amendment to the Food, Drug, and Cosmetics Act. Section 510(k), which allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required.

32.    Defendants advertised the Problem Products through multiple channels, including through traditional print and video advertisements, online websites and advertisements, and through treating physicians. Defendants broadly marketed the Problem Products as devices beneficial to the user's health; health benefits were, in fact, the primary selling point for the Problem Products.

33.    For example, in marketing materials, Philips described the Problem Products as part of its portfolio for "[b]etter healthcare through innovation, collaboration and transformation" and marketed itself as a "health technology company focused on improving people's lives" through "healthy living." Philips claims that it "partners with customers to deliver integrated solutions that enable better outcomes at lower cost." Products that cause serious adverse health effects are not "better healthcare"; cancer is not a "better outcome."

34.    Referring specifically to the Dream line of products, including the DreamStation, Philips marketed the devices as promoting "physical…well-being." A reasonable consumer would not perceive the Problem Products, which pose serious health risks, as advancing the owner's well-being.

35.     Philips did not disclose in its marketing materials that the Problem Products cause headaches, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects.

**III.     Defendants Disclose the Risks Posed by the Problem Products**

36.     On April 26, 2021, Philips first disclosed in its quarterly report that owner reports had led Philips to discover that the PE-PUR sound abatement foam Philips used to minimize the noise in several CPAP and BiPAP machines posed health risks to its users. Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances," including "certain environmental conditions involving high humidity and temperature."

37.     Philips has utilized polyester-based polyurethane (PE-PUR) sound abatement foam to dampen device vibration and sound during routine operation.

38.     On June 14, 2021, due to extensive ongoing review following the announcement on April 26, 2021, Philips issued a recall notification for specific affected devices. Philips identified examples of potential risks, which include exposure to degraded sound abatement foam particles and exposure to chemical emissions from the sound abatement foam material.

39.     Philips reported that, based on lab testing and evaluations, these potential health risks could result in a wide range of potential harms, ranging from temporary injuries, symptoms, and complications to serious injury, life-threatening or permanent impairments requiring medical intervention.

40.     According to Philips' recall notice, the PE-PUR Foam used in the Problem Products puts the Problem Products' users at risk of suffering from the following health harms:

> Particulate exposure can cause headache, irritation [skin, eye, and respiratory tract], inflammation, respiratory issues, and possible toxic and carcinogenic effects[;] [and] potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects.

41.     On June 14, 2021, Philips also issued a brief report titled "Clinical Information for Physicians." In this report, Philips disclosed that the absence of any visible particles in the devices does not mean that the potentially harmful breakdown of the foam sound insulation has not already begun. Even absent any visible evidence of a problem, "[l]ab analysis of the degraded foam reveals the presence of potentially harmful chemicals including [i] toluene diamine; [ii] toluene diisocyanate; [and] [iii] diethylene glycol."

42.     Philips also disclosed that lab testing performed by and for Philips has also identified the presence of volatile organic compounds ("VOCs") , which the sound abatement foam component of the machines may emit. Philips stated:

> VOCs are emitted as gases from the foam included in the [Problem Products] and may have short- and long-term adverse health effects. Standard testing identified two compounds of concern may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following: [i] Dimethyl Diazine; [and] [ii] Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl).

43.     In total, Philips announced that "[b]etween 3 million and 4 million" devices are targeted in the recall. The list of the devices recalled by Phillips (i.e, the "Problem Products") include:

(i)     E30

(ii)    DreamStation ASV

(iii)   DreamStation ST, AVAPS

(iv)    SystemOne, ASV4

(v)     C Series  ASV, S/T, AVAPS

(vi)    OmniLab Advanced Plus, In-Lab Titration Device

(vii)   SystemOne (Q series)

(viii)  DreamStation CPAP, Auto CPAP, BiPAP

(ix)    DreamStation GO CPAP, APAP

(x)     Dorma 400, 500 CPAP

(xi)    REMStar SE Auto CPAP

(xii)   Trilogy 100 Ventilator

(xiii)  Trilogy 200 Ventilator

(xiv)   Garbin Plus, Aeris, LifeVent Ventilator

(xv)    A-Series BiPAP Hybrid A30

(xvi)   A-Series BiPAP V30 Auto Ventilator

(xvii)   A-Series BiPAP A40

(xviii) A-Series BiPAP A30

44.    Defendants' advice to owners of the Problem Products is notable. Rather than providing owners a replacement product, a repair, or a refund, Defendants advise that owners should "[d]iscontinue use of affected unites and consult with physicians to determine the benefits of continuing therapy and potential risks."

45.    Many owners who rely on CPAP and BiPAP machines to breathe at night cannot simply discontinue using their Philips machines unless they can first purchase a new, safe machine. This option to purchase a new machine is difficult, if not impossible, for many such owners because Philips offers no refund or compensation the owner could use to purchase a new device, and Medicaid, Medicare, and private health insurance will not pay for new CPAP machines under these circumstances. Many owners, therefore, will be forced to follow the latter part of Defendants' advice: to continue therapy with the Problem Products, thus continuing to expose themselves to serious health risks.

46.    Philips's forcing consumers to choose between the serious health risks of *discontinuing* use of the Problem Products (as many cannot afford a new machine) and the serious

health risks of *continuing* use of the Problem Products, is fundamentally unfair and disregards Philips' obligations under applicable state consumer protection, the UCC, and common law.

47.    Owners have suffered and will inevitably suffer economic harm in the form of out-of-pocket for new machines when Philips has a legal obligation to repair or replace the machines (or refund the purchase price, thus permitting owners to buy a new machine). Owners also suffered economic losses from Philips' deception at the point of sale, as they received a substantially less valuable product than Defendants promised the product to be. That is, there is a substantial difference in value between the product Defendants promised (a machine beneficial to the user's health and well-being) and the product ultimately delivered (a machine harmful to the user's health and well-being). Finally, owners have suffered economic loss in the form of out-of-pocket losses for medical diagnosis and treatment for conditions caused by the Problem Products and the ongoing monitoring of the harmful effects of the Problem Products.

## Tolling

48.    Plaintiff and the Classes had no way of knowing about Philips's conduct or the health risks associated with using the Problem Products until Philips' June 14, 2021 recall notice (or, perhaps, at the very earliest, the issuance of Philips' April 26, 2021 quarterly report).

49.    Through the exercise of reasonable care, Plaintiff and the Classes could not have discovered the conduct by Philips alleged herein. Further, Plaintiff and the Classes did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein until Philips' June 14, 2021 recall notice (or, perhaps, at the very earliest, the issuance of Philips' April 26, 2021, quarterly report).

50.     Moreover, by failing to provide immediate notice of the adverse health effects associated with continued use of the Problem Products, Defendants concealed its conduct, and the existence of the claims asserted herein from Plaintiff and the Classes.

51.     Defendants had actual knowledge of the serious adverse health effects owners were experiencing from the Problem Products based upon complaints made directly to Defendants and other locations in which consumers posted such complaints. Defendants intended their acts to conceal the facts and claims from Plaintiff and the Classes. Plaintiff and the Classes were unaware of the facts alleged herein without any fault or lack of diligence on her part and could not have reasonably discovered Defendants' conduct.

52.     For these reasons, any statute of limitations should be tolled until the date of the recall notice.

## Class Allegations

53.     Plaintiff re-alleges and incorporates the allegations contained in the paragraphs above.

54.     Plaintiff brings this action under Federal Rule of Civil Procedure 23 on behalf of herself and two proposed classes. First, Plaintiff brings this action on behalf of a National Class consisting of:

> All persons in the United States who purchased or used a CPAP, BiPAP, or ventilator device manufactured by Philips and identified as included in the recall notice issued by Philips Respironics on June 14, 2021.

55.     Second, Plaintiff brings this action on behalf of a Florida Class consisting of:

> All persons in Florida who purchased or used a CPAP, BiPAP, or ventilator device manufactured by Philips and identified as included in the recall notice issued by Philips Respironics on June 14, 2021.

56.    The National Class and the Florida Class are referred to together in this complaint as the "Classes," and members of both classes together are referred to as "Class Members." Plaintiff reserves the right to amend the definition of the National Class and/or the Florida Class.

57.    This action is properly maintainable as a class action.

58.    The members of each of the Classes are so numerous that joinder of all members is impractical.

59.    The members of both Classes are so numerous that joinder of all members is impractical.

60.    Common questions of law and fact exist as to the members of the Florida Class and the National Class and predominate over any questions solely affecting individual members of the Classes. Among the questions of law and fact common to the Classes are:

(i)    Whether Philips deceived members of the Classes into purchasing the Problem Products by misrepresenting the products as safe and failing to disclose the existence of serious health risks posed by the Problem Products;

(ii)    Whether Defendants' practices constitute unfair or deceptive acts or practices under state consumer protection statutes;

(iii)    Whether the Problem Products fail under the implied warranty of usability;

(iv)    Whether the sale of Problem Products unjustly enriched defendants;

(v)    Whether Defendants were negligent in selling the Problem Products;

(vi)    Whether Defendants failed to warn consumers regarding the risks of the Problem Products;

(vii)    The appropriate nature of class-wide equitable relief; and

(viii)    The appropriate measurement of restitution and/or measure of damages to Plaintiff and members of the Classes.

61.    Plaintiff's claims are typical of the claims of the members of both Classes because, like Plaintiff, each member purchased the Problem Products and has suffered economic and non-economic harm similar to other members of the Classes.

62.    Plaintiff will fairly and adequately protect the interests of the members of the Classes and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff does not have any interest adverse to the Classes.

63.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Furthermore, the economic damages that Class Members have suffered are not likely substantial enough to warrant individual litigation, as the expense and burden of individual litigation would make it impracticable for all members of the Classes to seek such economic relief individually. There will be no difficulty in the management of this action as a class action.

64.    The prosecution of separate actions against Defendants would create a risk of inconsistent or varying adjudications among the individual Class members, which could establish incompatible standards of conduct for Defendants. In addition, adjudications for individual members of the Classes could, as a practical matter, be dispositive of the interests of the other members of the Classes not parties to such adjudications, or could substantially impede or impair their ability to protect their interests.

65.    The members of the Classes are readily identifiable through Defendants' and other records, and Plaintiff is a member of the Classes.

**Causes of Action**

**COUNT I**

**Breach of the Implied Warranty of Merchantability**

**(on behalf of the National Class and Florida Class)**

66.     Plaintiff and the Classes incorporate by reference all preceding paragraphs.

67.     By operation of law, Defendants, as manufacturers of the Problem Products and as the providers of a limited warranty for the Problem Products, impliedly warranted to Plaintiff and the Class that the Problem Products were of merchantable quality and safe for their ordinary and intended use.

68.     Defendants breached the implied warranty of merchantability in connection with the sale and distribution of the Problem Products. At the point of sale, the Problem Products, while appearing normal, contained defects as set forth herein, rendering them unsuitable and unsafe for personal use. Had Plaintiff and the Classes known the Problem Products were unsafe for use, they would not have purchased them.

69.     Defendants have refused to provide appropriate warranty relief, notwithstanding the risks of using the Problem Products. Plaintiff and the Classes reasonably expected that the Problem Products were safe for their ordinary and intended use at the time of purchase.

70.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the Classes have sustained damages in an amount to be determined at trial.

## COUNT II

### Breach of Written Warranty

### (on behalf of the National Class and Florida Class)

71.     Plaintiff and the Classes incorporate by reference all preceding paragraphs.

72.     Defendants warranted that the Problem Products "shall be free from defects of workmanship and materials and will perform per the product specifications for a period of two (2) years from the date of sale."

73.     Defendants breached this written warranty in connection with the sale and distribution of Problem Products. At the point of sale, the Problem Products, while appearing normal—contained immediate defects as set forth herein, rendering them unsuitable and unsafe for personal use.

74.     Had Plaintiff and the Classes known the Problem Products were unsafe for use, they would not have purchased them.

75.     Defendants have breached their warranty and refused to provide appropriate warranty relief, notwithstanding the risks of using the Problem Products. Plaintiff and the Classes reasonably expected that the Problem Products were safe for their ordinary and intended use at the time of purchase.

76.     As a direct and proximate result of Defendants' breach of their written warranty, Plaintiff and the Classes have sustained damages in an amount to be determined at trial.

## COUNT III

### Strict Liability – Failure to Warn

### (on behalf of the National Class and Florida Class)

77.     Plaintiff and the Classes incorporate by reference all preceding paragraphs.

78.     Defendants had a duty to warn Plaintiff and the Class Members regarding the defect and true risks associated with the ProblemProducts.

79.     Defendants failed to provide adequate warnings regarding the risks of the PE-PUR foam.

80.     Defendants had information regarding the true risks but failed to warn Plaintiff, Class Members, and their physicians to strengthen their warnings.

81.     Despite Defendants' obligation to unilaterally strengthen the warnings, Philips instead chose to actively conceal this knowledge.

82.     Plaintiff and Class Members would not have purchased, chosen, or paid for all or part of the Problem Products had they known the defect and risks of purchasing the product.

83.     This defect proximately caused Plaintiff's and Class Members' injuries, including economic injuries and headache, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

84.     Plaintiff and the Class suffered damages in an amount to be determined at trial.


## COUNT IV

### Design Defect Strict Liability

### (on behalf of the National Class and Florida Class)

85.     Plaintiff and the Classes incorporate by reference all preceding paragraphs.

86.     The design of the Problem Products, including but not limited to design and use of the foam and the placement of the foam within the Problem Products, was defective and unreasonably dangerous, causing degradation and inhalation of the foam, which may cause headaches, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

87.     The design of the Problem Products and the foam rendered the Problem Products not reasonably fit, suitable, or safe for their intended purpose.

88.     The dangers of the Problem Products outweighed the benefits and rendered the products unreasonably dangerous. Indeed, other CPAP and other machines do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestions, such as Defendants' next-generation DreamStation machines.

89.     Safer, alternative machines from other manufacturers were available that did not suffer from the defects this complaint describes. They did not have an unreasonable risk of harm as with the Problem Products and their unsafe foam.

90.     The risk-benefit profile of the Problem Products was unreasonable, and the products should have had stronger and clearer warnings or should not have been sold in the market.

91.     The Problem Products did not perform as an ordinary consumer would expect.

92.     Plaintiff and the Classes suffered damages in an amount to be determined at trial.


## COUNT V

### Negligent Failure to Warn

### (on behalf of the National Class and Florida Class)

93.     Plaintiff and the Classes incorporate by reference all preceding paragraphs.

94.     Defendants owed Plaintiff and Class Members a duty of care and to warn of any risks associated with the Problem Products. Defendants knew or should have known of the true risks but failed to warn Plaintiff, Class Members, and their doctors.

95.     Defendants' negligent breach of duty caused Plaintiff and Class Members economic damages and injuries in the form of headache, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects

96.     Plaintiff and Class Members would not have purchased, chosen, and/or paid for all or part of the Problem Products had they known that the risks associated with purchasing the product.

97.     Plaintiff and the Class suffered damages in an amount to be determined at trial.

## COUNT VI

### Negligent Design Defect

### (on behalf of the National Class and Florida Class)

98.     Plaintiff and the Classes incorporate by reference all preceding paragraphs.

99.     Defendants negligently designed the Problem Products. Philips owed Plaintiff a duty to design the Problem Products in a reasonable manner. The design of the Problem Products, including but not limited to design of the foam and the placement of the foam within the Problem Products, was defective and unreasonably dangerous, causing degradation and inhalation of the foam, and causing headaches, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

100.    The design of the Problem Products and the foam rendered the Problem Products not reasonably fit, suitable, or safe for their intended purpose.

101.    The dangers of the Problem Products outweighed the benefits and rendered the products unreasonably dangerous. Indeed, there are other CPAP and other machines that do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestions, such as Defendants' next-generation DreamStation machines.

102.    Safer, alternative machines from other manufactures were available which did not have an unreasonable risk of harm as with the Problem Products and their unsafe foam.

103.    The risk-benefit profile of the Problem Products was unreasonable, and the products should have had stronger and clearer warnings or should not have been sold in the market.

104.    The Problem Products did not perform as an ordinary consumer would expect.

105.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

## COUNT VII

**Breach of Express Warranty by Description under UCC §2-313(b)**

**(on behalf of the National Class and Florida Class)**

106.    Plaintiff and the Classes incorporate by reference all preceding paragraphs.

107.    The UCC provides: "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to that description."

108.    Defendants described the Problem Products in its advertisements, press releases, specifications provided to dealers, information provided to the press, and through other media, which it knew would be communicated to consumers either directly or indirectly. Defendants' description included that the Problem Products would be safe for their intended use. Defendants repeated representations that the Problem Products would be safe for their intended use were express warranties by description under UCC § 2-313(b).

109.    Defendants' express warranties by description—that the Problem Products would be safe for their intended use—induced Plaintiff and other Class Members to purchase the Problem Products.

110.    Defendants' express warranties by description became part of the basis of the bargain into which Plaintiff and other Class Members entered when they purchased the Problem Products.

111.    Given the significance of health and safety issues to consumers purchasing a medical device, as represented by Defendants' prominent representation of the Problem Products as safe, the natural tendency of Defendants' descriptions of the Problem Products as safe was to induce the purchase of the Problem Products.

112.    Defendants breached their express warranties by description with Plaintiff and other Class Members by delivering Problem Products that were unsafe when used in a foreseeable manner.

113.    By delivering unsafe products, Defendants have breached their express warranties by description to the purchasers and lessees of the Problem Products, including the Plaintiff and Class Members.

114.    As a direct and proximate result of Defendants' breaches of their express warranties by description with Plaintiff and Class Members, Plaintiff and Class Members did not receive the full benefit of their bargain and suffered damage by receiving unsafe products.

115.    Defendants are liable to Plaintiff and the Class Members for all damages caused by Defendants' breach of express warranties by description.

## COUNT VIII

### Fraudulent Misrepresentation

### (on behalf of the National Class and Florida Class)

116.    Plaintiff and the Classes incorporate by reference all preceding paragraphs.

117.    Defendants represented their products as safe for their intended use, including, for example, by marketing the products as promoting "better healthcare," "better outcomes," and "physical well-being." These representations were not true. Moreover, Defendants failed to

disclose to Plaintiff and the Classes that the Problem Products posed serious health risks to their users.

118.    Defendants intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiffs and Class Members to purchase the Problem Products.

119.    Defendants knew that their representations and omissions about the Problem Products were false in that the Problem Products contained PE-PUR Foam and thus were at risk of causing adverse health effects to owners of the Problem Products, contrary to the products' labels, packaging, advertising, and statements.

120.    Defendants knowingly and intentionally caused their packaging, labels, advertisements, promotional materials, and websites to mislead consumers, such as Plaintiffs and the Classes.

121.    Plaintiff and the Class and Subclasses relied on these omissions and misrepresentations and purchased and used the Problem Products to their detriment. Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Problem Products, Plaintiff's and the Classes' reliance on Philips' omissions and misrepresentations was justifiable.

122.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Classes have suffered actual damages in that they purchased the Problem Products (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks associated with the use of the Problem Products, and (c) which did not conform to the Problem Products' labels, packaging, advertising, and Defendants' other statements.

123.    Plaintiff and the Classes seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT IX

### Negligent Misrepresentation

### (on behalf of the National Class and Florida Class)

124.    Plaintiff and the Classes incorporate by reference all preceding paragraphs.

125.    Defendants represented their products as safe for their intended use, including, for example, by marketing the products as promoting "better healthcare," "better outcomes," and "physical well-being." These representations were not true. Moreover, Defendants failed to disclose to Plaintiff and the Classes that the Problem Products posed serious health risks to their users.

126.    Defendants had a duty to Plaintiff and the Classes to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of the Problem Products.

127.    Defendants breached their duty to Plaintiff and the Classes by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Classes that did not have the qualities, characteristics, and suitability for use as advertised by Defendants and by failing to remove the Problem Products promptly from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Problem Products.

128.    Defendants knew or should have known that the qualities and characteristics of the Problem Products were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Defendants. Specifically, Defendants knew or should have known that: (a) the use of the Problem Products was accompanied by a risk of adverse health effects contrary to marketing, packaging, and labeling that indicated that the products were safe; (b)

Problem Products were adulterated, or at risk of being adulterated, by the PE-PUR Foam; and (c) the Problem Products were otherwise not as warranted and represented by Philips.

129.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Classes have suffered actual damages in that they purchased the Problem Products (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known they contained PE-PUR Foam that could cause users of the Problem Products to suffer adverse health effects, and (c) which do not conform to the products' labels, packaging, advertising, and statements.

130.    Plaintiff and the Classes seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

## COUNT X

**Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.**

**(on behalf of the Florida Class)**

131.    Plaintiff and the Florida Class incorporate by reference all preceding paragraphs.

132.    At all relevant times, the Defendants were engaged in commerce within the State of Florida, as defined by Fla. Stat. § 501.203(8), and are therefore subject to the provisions contained in Fla. Stat. § 501.201, et seq., the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

133.    Defendants have engaged in deceptive, unfair, fraudulent and/or misleading commercial practices in the advertising, promotion, marketing, distribution, and selling of the Problem Products.

134.    Defendants represented that Problem Products had characteristics, uses, benefits, or qualities that they did not have—specifically, that the products were safe for their intended and anticipated use, and that the products promote "better healthcare," "better outcomes," and "physical well-being." These representations were not true. Defendants failed to disclose to Plaintiff and the Classes that the Problem Products posed serious health risks to their users.

135.    In its advertising, promotion, marketing, distributing, and selling the Problem Products, Defendants misrepresented material facts to Plaintiff and other members of the Florida Class concerning the products' safety.

136.    Defendants' conduct was objectively deceptive and had the capacity to deceive reasonable consumers under the circumstances. The fact that the Problem Products posed serious health and safety risks to owners was a material fact to which a reasonable consumer would attach importance at the time of purchase.

137.    Defendants' practices, as detailed herein, constituted unfair or deceptive practices in violation of FDUTPA, Fla. Stat. § 501.201, et seq.

138.    As a direct and proximate result of Defendants' violations of FDUTPA, Plaintiff and other members of the Florida Class have suffered ascertainable losses, which include but are not limited to, the failure to receive the benefit of the bargain promised to them by Defendants (i.e., the Problem Products they received were less valuable at the time of purchase than the products Defendants promised to them); and out-of-pocket costs they incurred in response to the health problems caused by the Problem Products. Accordingly, Plaintiff and other members of the Florida Class were harmed by, and Defendants are liable for, Defendants' actions in violation of FDUTPA.

## Count XI

### Unjust Enrichment

### (in the alternative, on behalf of the National Class and Florida Class)

139.    Plaintiff and the Classes incorporate by reference all preceding paragraphs.

140.    Plaintiff and the Class Members conferred a tangible and material economic benefit upon Defendants by purchasing the Problem Products. Plaintiff and Class Members would not have purchased, chosen, or paid for all or part of Problem Products had they known the true risks of using the Problem Products or that Defendants cannot provide a timely repair or replacement for the Problem Products. Under these circumstances, it would be unjust and inequitable for Defendants to retain the economic benefits they received at the expense of Plaintiff and the Classes.

141.    Failing to require Defendants to provide remuneration under these circumstances would result in Defendants being unjustly enriched at the expense of Plaintiff and the Class Members who endure being exposed to the risk of developing serious medical conditions and can no longer use their machines safely.

142.    Defendants' retention of the benefit conferred upon them by Plaintiff and the Classes would be unjust and inequitable.

143.    Plaintiff and the Classes are entitled to restitution in an amount to be determined at trial.

### Prayer for Relief

**WHEREFORE,** Plaintiff requests, individually and on behalf of the proposed Classes, that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of

the National Class and Florida Class defined above, and designate Plaintiff as the class representative and Plaintiffs' counsel as counsel for both Classes;

B.      award equitable and preliminary and permanent injunctive relief, including but not limited to, requiring Defendants to either: a) immediately replace each class members' Problem Product with a CPAP machine that does not have the defects and pose the health risks of the Problem Products or b) immediately refund to all class members the price they paid for the Problem Products so they can purchase another CPAP machine that is not a health risk to them which will enable them to obtain the necessary health benefits they need from a CPAC machine.

C.      award all actual, general, special, incidental, punitive, and consequential damages to which Plaintiff and Class members are entitled;

D.      award pre-judgment and post-judgment interest on such monetary relief;

E.      award reasonable attorneys' fees and costs; and

F.      grant such further and other relief that this Court deems appropriate.

## **Jury Demand**

Plaintiff and the Class demand a trial by jury on all issues so triable.

Dated: July 29, 2021

By her attorneys,

*/s/ Patrick J. Vallely*
Edward F. Haber (BBO # 215620)
Patrick J. Vallely (BBO # 663866)
**SHAPIRO HABER & URMY LLP**
Seaport East
Two Seaport Lane, Floor 6
Boston, MA 02210
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
pvallely@shulaw.com

Robert C. Schubert (BBO # 562242) (*pro hac vice* forthcoming)
Dustin L. Schubert (*pro hac vice* forthcoming)
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
 (415) 788-4220 – Telephone
 (415) 788-0161 – Fascimile
rschubert@sjk.law

***Attorneys for Sherry Dedman and the Proposed Class***